IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Jacqueline Grier,

        Plaintiff,

v.

Bryden Management, LLC, *et al.*,

        Defendants.

Case No. 2:17-cv-111

Judge Graham

Magistrate Judge Vascura

Opinion and Order

Plaintiff Jacqueline Grier brings this suit under the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, alleging that her landlord, defendant Bryden Management, LLC, unlawfully refused to accommodate her request to house her emotional support animal in her apartment. This matter is before the court on defendants' motion for summary judgment, which is granted for the reasons stated below.

**I.    Background**

Jacqueline Grier alleges that she suffers from a post-traumatic stress disorder which causes severe anxiety and depression. According to the complaint, her disorder stems from numerous factors and events, including the death of her husband, serious injuries she suffered in a motor vehicle accident, her unemployment for well over a decade, and discovering the body of a friend who had been murdered. For purposes of summary judgment, defendants do not contest Grier's assertion that she suffers from post-traumatic stress disorder.

In early 2016 Grier decided that she would move from Florida to Columbus, Ohio, where she and her husband had once lived before he passed away. In advance of moving, she contacted Bryden Management to inquire about renting an apartment at Bryden's West Bexley Apartment complex, which was known at the time as "Bryden House." Grier spoke with a leasing agent, defendant Martha Bennett, and informed her that she was disabled and required having her emotional support animal (ESA) living with her.

Grier and Bennett spoke by telephone several times and addressed the details necessary for Grier to reside at the Bryden House apartment complex. See Grier Dep. at 66-67; Bennett Dep. at 63. Bennett said that Brier would be allowed to have an emotional support animal reside with her if she provided medical documentation. See Grier Dep. at 37, 67.

Grier's ESA was a small dog, a Chihuahua named Votto. On February 5, 2016 Grier completed a residential lease application to reside at Bryden House. See Doc. 67 at PAGEID 605. She indicated that she would have Votto residing with her and that she would provide documentation of Votto being an ESA. On February 26, 2016, defendants received a letter from Heart of Ohio Family Health stating that Grier "requires the presence of a companion animal for emotional support" and "should be allowed to keep her pet dog in her apartment." Doc. 67 at PAGEID 611.

When Grier relocated to Columbus, she did not move directly into Bryden House. She first lived with an acquaintance for several weeks. She had Votto with her, as well as a puppy, Rocket, which Votto had sired. See Grier Dep. at 33. Grier intended to find a home for Rocket, and she believed that she had found someone who would take Rocket prior to her moving into Bryden House. Grier told Bennett that she had a second dog but assured her that Rocket "was going to be going to another home." Id. at 35.

On March 4, 2016, Grier completed a lease agreement with defendants. See Doc. 67 at PAGEID 612. Included was a Pet Addendum that had lines for the listing of more than one pet. Grier listed only Votto. Grier and Bennett both signed the Pet Addendum. Grier understood that under the Pet Addendum, Bryden House would impose a non-refundable pet fee of $200 for pets which did not qualify as a service animal or an ESA. See Grier Dep. at 63.

Grier moved into her apartment soon after signing the lease agreement. She resided there with both dogs. See Compl., ¶ 18; Bennett Dep. at 66-68. Neither Bennett nor defendant Sarah Tucker, the property manager, knew that Grier was keeping Rocket in her apartment until they came to Grier's unit about an unrelated matter. See Bennett Dep. at 67-68. They heard two dogs barking and saw them both inside the apartment when Grier opened the door.[1] See id.

Bennett does not remember Tucker saying anything to Grier about Rocket on the day they discovered that Grier was keeping a second dog in her apartment. See Bennett Dep. at 69. According to Grier, Tucker confronted her at some point and insisted that she pay the pet fee or face eviction. See Grier Dep. at 64-65; Compl., ¶ 24. Tucker does not recall the alleged exchange taking place. See Tucker Dep. at 34.

Grier contacted an attorney at the Legal Aid Society of Columbus. See Grier Dep. at 65. On March 22, 2016, the attorney sent a letter to Tucker requesting a reasonable accommodation on behalf

---

[1] Tucker suffers from memory loss and could not recall exactly when this event took place. See Tucker Dep. at 11, 58. Bennett also could not recall. See Bennett Dep. at 66. The complaint suggests that it occurred about a week after Grier moved in. See Compl., ¶ 19.

2

of Grier.  See Doc. 67 at PAGEID 631.  Specifically, the letter stated that Grier "has been prescribed two emotional support dogs by her doctor.  According to Ms. Grier, her doctor's office has faxed you a copy of that prescription."  Id.  The letter requested the accommodation of Grier keeping "her emotional support animals in her apartment."  Id.

Despite the attorney's statements in the March 22 letter that Grier had been prescribed a second ESA and that the prescription had been faxed to defendants, there is no evidence of record to show that either statement was true.  Grier was asked in her deposition if she had been prescribed two ESAs before March 22.  She stated that she could not remember, but she does remember going to her doctor's office on April 4 to get a prescription for the second ESA.  See Grier Dep. at 40-41, 53.  And the only prescriptions which Grier was aware had been presented to Bryden House were the one dated February 26 and another one dated April 4, 2016.  See id. at 57-59.

Tucker testified that she had only the February 26 prescription for one ESA when she received the March 22 letter.  See Tucker Dep. at 80.  Tucker called Grier's attorney and asked for a copy of the prescription for two ESAs.  See id. at 78.  There is no evidence that the attorney responded to Tucker's request.

Grier testified that on April 4, 2016, she had a confrontation with Tucker.  Grier attempted to pay rent for the month of April, but Tucker would not accept the payment, saying that Grier needed to pay the pet fees for Rocket.  See Grier Dep. at 64-65, 72.  Grier refused to pay any pet fees.  Id. at 67-68.  Rent was due on April 5, and, according to Grier, Tucker made a threat that Grier had "24 hours to get rid of [her] dog or she was going to start eviction on [Grier]."  Id. at 71-72.  Tucker does not recall having this conversation with Grier, but admits that, given her memory loss, the conversation may have taken place.  See Tucker Dep. 86.  Tucker left a voicemail on April 4 with Legal Aid in which she similarly stated that Grier would face eviction if she did not relocate Rocket.  See Parker Decl., ¶ 10.

Grier knew that she needed to get a prescription for Rocket.  See Grier Dep. at 42.  She went to her doctor at Heart of Ohio Family Health on or about April 4.  See id. at 40-41.  Heart of Ohio Family Health provided a letter, dated April 4, to Bryden House.  See Doc. 67 at PAGEID 632.  This letter stated that Grier "should be allowed to keep two companion pets for emotional support."  Id.  Bennett testified that the April 4 prescription was received by Bryden House, but it is unclear whether it was received on that day or the next day.  See Bennett Dep. at 85; Doc. 67 at PAGEID 632 (showing a fax time stamp of April 5 at 2:30 p.m.).

3

On April 7, 2016, Legal Aid provided the April 4 Ohio Family Health letter to Dimitri Hatzifotinos, legal counsel for Bryden House, and requested that Grier be able to stay in her apartment without paying pet fees. See Parker Decl., ¶¶ 18-19. On the same day, Hatzifotinos promised that an eviction would not be initiated until the reasonable accommodation issue was resolved. Id. at ¶ 20.

On Friday, April 8, Tucker signed a letter to Grier that stated, "I spoke with the attorney. The deposit for both of your dogs is waived. Please bring your rent to the office. We are sorry for any inconvenience that this has caused." Doc. 67 at PAGEID 633. There is a note indicating that the letter was to be hand-delivered by security staff on April 8. Bryden House's policy was for its security staff to leave such notices at the door if the tenant did not answer their door. See Tucker Dep. at 89.

Grier denies that she received the April 8 letter from Bryden House. See Grier Dep. at 71, 73. Grier moved out of her apartment over the weekend, on April 9 and 10. Id. at 76. Grier testified that she moved out because of Tucker's prior threat to start the process of evicting her if she did not "get rid of her dog." Id. at 71-72. Grier felt like she "had no choice" because she "couldn't get rid of the dog." Id. at 76.

On Monday, April 11, Grier went to Tucker to turn in her key. Id. at 75. Tucker stated that the attorneys for Grier and Bryden House had "settled" the dog fee issue, that it "was done" and there would be no fee assessed against her. Id.; Doc. 67 at PAGEID 635 (Grier's contemporaneous notes of the conversation). Tucker refused to accept the key from Grier. See Grier Dep. at 76. Grier testified that this was the first time she had been told that the issue had been resolved. Id. at 78. In Grier's view, this communication came "too late" because she had already moved out of her apartment. Id. at 80.

Grier did not move back to Bryden House and did not pay her rent. On April 20, 2016, Bryden House initiated an eviction proceeding so that they could gain access to Grier's unit, which still had personal items in it. See Tucker Dep. at 44, 105-06; Doc. 67 at PAGEID 636. Grier was not aware that the eviction proceeding was filed. See Grier Dep. at 82-83. Bryden House voluntarily dismissed the proceeding on April 27. Doc. 67 at PAGEID 636.

## II.     Motion for Summary Judgment

### A.     Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586

4

F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III. Discussion

Grier asserts claims under the Fair Housing Act and Ohio law based on defendant's alleged refusal to accommodate her disability and of their alleged interference with her enjoyment of her chosen housing. 42 U.S.C. §§ 3604(f)(3)(B), 3617; O.R.C. § 4112.02(H). Grier also brings a claim for unlawful discrimination under the Rehabilitation Act. 29 U.S.C. § 794.

5

### A. Reasonable Accommodation

It is unlawful for a housing provider to refuse to make a reasonable accommodation in rules, policies, practices or services, when the accommodation is necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

A FHA reasonable-accommodation plaintiff must prove that: (1) she suffers from a disability, (2) she requested an accommodation necessary to afford her an equal opportunity to use and enjoy the dwelling, (3) the requested accommodation was reasonable, (4) the defendant housing provider refused to make the accommodation, and (5) the defendant knew or should have known of the disability at the time of the refusal. Hollis v. Chestnut Bend Homeowners Ass'n, 760 F.3d 531, 541 (6th Cir. 2014); Overlook Mut. Homes, Inc. v. Spencer, 415 Fed. App'x 617, 621 (6th Cir. 2011).

Only the fourth element – whether defendants refused to make the requested accommodation – is at issue on summary judgment. "As a general rule, housing providers should cooperate with residents to resolve disputes over reasonable accommodations . . ." Overlook, 415 Fed. App'x at 623. A court should consider whether a housing provider delayed or obstructed the process of negotiating an accommodation and whether the housing provider took adverse action, such as initiating eviction proceedings or removing a claimed service or support animal, during the accommodation process. Id. at 621.

Plaintiff argues that defendants violated the FHA because they refused to grant her request to house a second ESA. She claims that her request was effectively denied when property manager Tucker demanded that she pay pet fees and threatened to initiate eviction proceedings if she failed to do so. Plaintiff contends that it is no defense for defendants to claim that they needed medical verification for the second ESA. According to plaintiff, it was sufficient that defendants had knowledge, as opposed to verification, of the need for an accommodation.

The court will address the medical verification argument first. Plaintiff has cited no legal support for the assertion that defendant cannot seek verification of the need for accommodation. Indeed, the case law stands for just the opposite proposition: "A housing provider, however, is entitled to seek information from an allegedly disabled person in order to establish the existence of the disability and the necessity of the accommodation." Overlook, 415 Fed. App'x at 621; see also United States v. Trumbull Metro. Hous. Auth., No. 4:17-CV-101, 2017 WL 4882438, at *5 (N.D. Ohio Oct. 30, 2017). The extent to which a housing provider may seek documentation can vary with the circumstances – in some cases, a person's disability might be obvious and the "inquiry need not be highly intrusive." Overlook, 415 Fed. App'x at 621-22. And a housing provider cannot demand

"unreasonably excessive information" in an attempt to "stonewall" or "short-circuit" the accommodations process. Id. at 622.

The court finds as a matter of law that it was reasonable and lawful for defendants to seek medical verification when Grier asserted the need for a second ESA. All the information available to defendants at that point indicated that Grier needed just one ESA. Grier listed only Votto on the lease application and on the lease agreement, and she told Bennett before moving in that Rocket was "going to another home." The February 26 doctor's letter indicated that she needed just one dog as an ESA. Grier claimed the need for a second ESA only after defendants discovered that she had been secretly housing a second dog since she had moved into the apartment. No reasonable jury would find that defendants' request for medical verification for the second dog was intrusive, excessive, unreasonable or intended to stonewall or short-circuit the process.

The court further finds that plaintiff has failed to demonstrate a genuine dispute of material fact to support her theory that defendants effectively refused to grant her an accommodation when they demanded that she pay the pet fees or face eviction. The March 22 letter from Legal Aid stated that defendants would receive documentation of Grier's need for a second ESA, but they did not. According to Grier's own account, the time period between March 22 and Monday, April 4, the day before rent was due, elapsed without her producing a prescription for a second ESA to defendants. Having not received any medical verification for Rocket, Tucker made a demand that was consistent with the parties' rights and obligations under the lease agreement – that Grier either pay the fees for Rocket or relocate him, or else she must leave the apartment.

Tucker finally did receive the prescription later in the day on April 4 or on April 5. For the rest of the week, defendants took no steps to evict Grier or remove Rocket, and they made no more demands that she pay pet fees. Grier and both of her dogs continued to occupy her apartment with no interference from defendants. On April 7, an attorney on behalf of defendants contacted the Legal Aid attorney who had been assisting Grier and assured her that defendants would not initiate eviction proceedings until the accommodation request had been addressed. Defendants then decided that they would grant Grier's request for a second ESA and they attempted to inform her of that decision on Friday, April 8.

Even though Grier states that she did not get the April 8 notice granting her request, Tucker informed Grier of the grant of her request the next time that they saw each other, on Monday, April 11. According to Grier, Tucker told her that the accommodation issue had been settled and that there

would be no pet fee assessed against her. Tucker declined to take the key from Grier when she tried to turn it in.

In conclusion, defendants were entitled to request medical verification from Grier of her need for a second ESA. When she failed to provide verification, defendants made a demand consistent with the terms of the lease agreement. And when Grier at last produced a prescription at the same time rent was due (a Tuesday), defendants cooperated with her and her legal counsel, allowed her and Rocket to stay pending their consideration of her accommodation request, and granted her request by the end of the week. The court finds as a matter of law that defendants did not refuse to grant plaintiff's request for a reasonable accommodation. See Overlook, 415 Fed. App'x at 623 (holding that the housing provider did not refuse an accommodation request for an ESA where they "never began eviction proceedings against the Spencers, nor was Scooby removed from their home" while the request was considered); Dubois v. Ass'n of Apartment Owners of 2987 Kalakaua, 453 F.3d 1175, 1179 (9th Cir. 2006) (granting summary judgment to housing provider who allowed plaintiffs to keep service animal while it considered the accommodation request – "Since the Condominium Association never refused to make the requested accommodation, plaintiffs' FHA claim necessarily failed.").

**B.  Interference Claim**

**1.  Threat of Eviction**

Plaintiff next asserts that defendants violated the FHA's anti-interference provision. 42 U.S.C. § 3617. The violation allegedly occurred when Tucker threatened on April 4 to initiate eviction proceedings against Grier within 24 hours if she did not pay pet fees for Rocket.

It is unlawful for a housing provider to "coerce, intimidate, threaten, or interfere" with the exercise or enjoyment of rights protected under the FHA. To state a claim under § 3617, a plaintiff must establish that: (1) she exercised or enjoyed a right guaranteed by §§ 3603–3606; (2) defendant's intentional conduct constituted coercion, intimidation, threat, or interference; and (3) a causal connection exists between her exercise or enjoyment of a right and the defendant's conduct. Hood v. Midwest Sav. Bank, 95 Fed. App'x 768, 779 (6th Cir. 2004). A plaintiff must also prove "discriminatory animus" to prevail on her interference claim. HDC, LLC v. City of Ann Arbor, 675 F.3d 608, 613 (6th Cir. 2012).

It is not disputed that Grier exercised a protected right by making an accommodation request. And the court will assume, without deciding, for purposes of the summary judgment motion that the alleged threat of eviction satisfies the second element of a claim. The court finds, however, that

plaintiff has failed to show that there is a genuine dispute of material fact as to the causal connection and discriminatory animus components of her claim.

Again, after Grier claimed that Rocket was an ESA, defendants requested verification. With Grier having failed to produce such verification and the parties being on the brink of when rent was due, defendants demanded that she either perform her contractual duty of paying the pet fees or be forced to leave. Plaintiff has put forth no evidence from which a jury could find that Tucker made the demand because Grier had requested an accommodation. Rather, the record is undisputed that, with Grier having failed to that point to cooperate in the accommodation process by providing defendants with verification for a second ESA, Tucker made the demand because Grier had been keeping a dog for which she had not paid the pet fees. When defendants were finally provided with verification of the second ESA, they readily granted the request, just as they had done for the first ESA.

### 2. April 20, 2016 Eviction Filing

Plaintiff further asserts that defendants interfered with her rights by filing an eviction proceeding in state court. This claim fails too. On April 8 and 11, defendants expressly offered Grier an opportunity to stay with both dogs. Grier refused the offer, did not pay her rent and moved out. The record establishes without factual dispute that defendants initiated the eviction proceeding not because Grier had made an accommodation request but to gain access to the apartment after she had moved out and left personal items in the unit.

### C. Remaining Claims

Plaintiff's claims under the Ohio Fair Housing Act are analyzed the same as her claims under the federal Act and thus fail as a matter of law. See Overlook, 415 Fed. App'x at 621 n.2 ("The Ohio Fair Housing Act is substantively identical to the FHA. Accordingly, our analysis of the latter applies to the Ohio law.") (citing cases).

Finally, defendants argue that they are entitled to summary judgment on plaintiff's claim for unlawful discrimination under the Rehabilitation Act because Bryden House did not receive federal financial assistance. See Pessar Dep. at 61 (managing member of Bryden Management testifying that Bryden does not receive federal funding). Plaintiff has not opposed this prong of defendants' motion for summary judgment, which the court finds should be granted. See Doherty v. So. College of Optometry, 862 F.2d 570, 573 (6th Cir. 1988) (holding that one element of a claim under the Rehabilitation Act is that "the program allegedly discriminating against [plaintiff] receives federal funding").

## IV. Conclusion

For the reasons state above, defendants' motion for summary judgment (doc. 67) is GRANTED in its entirety and this action is hereby dismissed.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 5, 2019